## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

RITA D. BISHOP,                          :

               Plaintiff,          :

                                         Case No. 3:08CV0375

  vs.                                    :

                                         District Judge Thomas M. Rose

MICHAEL J. ASTRUE,                       :      Magistrate Judge Sharon L. Ovington
      Commissioner of the Social
      Security Administration,            :

              Defendant.          :

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.  INTRODUCTION

Plaintiff Rita D. Bishop last worked in 2004, as a part-time pre-school aide.

(Tr. 14).  She claims to be disabled due to breathing problems, elevated

cholesterol, joint pain in her legs, feet and shoulders, and emotional issues.  (*Id*.).

As a result, she sought financial assistance from the Social Security

Administration by applying for both Disability Insurance Benefits ["DIB"] and

Supplemental Security Income ["SSI"] on September 16, 2004, alleging disability

since December 1, 2002.  (*See* Tr. 99-104).

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Following initial denials of her application, Plaintiff was provided with an administrative hearing (Tr. 493-521), after which Administrative Law Judge ["ALJ"] Melvin A. Padilla issued a written decision denying Plaintiff's application. (Tr. 12-25). ALJ Padilla based his decision on a conclusion that Plaintiff was not under a "disability" as defined by the Social Security Act. (Tr. 25). The ALJ's non-disability decision later became the Commissioner's final decision. Such decisions are subject to judicial review pursuant to 42 U.S.C. § 405(g), which Plaintiff is due in the present case.

This case is before the Court upon Plaintiff's Statement of Specific Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #11), the administrative record, and the record as a whole.

Plaintiff seeks an Order overturning the ALJ's decision and granting benefits, or at a minimum, remand of this case to the Social Security Administration to correct certain alleged errors. The Commissioner seeks an Order affirming the ALJ's decision.

## II.    BACKGROUND

Plaintiff was born in 1963 and was 45 years old when the ALJ issued his decision. (Tr. 57). She has the equivalent of a high school education and her previous jobs have included preschool/day care aide, press operator, janitor,

temporary worker, assembler, quality controller, housekeeper and sewing marker. (Tr. 92-98, 100, 103, 132-39). Plaintiff's application alleged that she was disabled due to "leaking valves," arthritis and depression. (Tr. 99). She indicated that she became able to work only part-time after she started having leg problems in late 2002, and that she had to stop working altogether in September 2004 because "I just couldn't do the job anymore." (Tr. 100).

During the September 17, 2007 hearing before the ALJ, Plaintiff testified that she and her husband lived by themselves in a mobile home. (Tr. 496-97). Their income is limited to her husband's Social Security and retirement benefits, plus welfare and food stamps. (*Id.*). She may drive four to five times a month, but "only if I have to." (Tr. 497).

Plaintiff last worked in September 2004 for about 16 hours a week as a preschool aide. (Tr. 498). Asked how her current condition differs from that in two unsuccessful disability applications she filed previously, Plaintiff explained: "I don't like to go out in public. I don't like to be around people. I get upset easy and I'm very depressed. I cry a lot." (Tr. 498). She stated that she ordinarily leaves home only to go to the doctor or to therapy. (Tr. 499). No one except her daughter visits her, because "I don't want nobody to come see me." (Tr. 499). Plaintiff claimed a decrease in appetite – "I don't eat sometimes" – but no loss

over the prior year from her stated weight of 240 pounds. (Tr. 496, 499-500). She

denied sleeping during the day, claimed to sleep only "about two to four hours"

on an average night, and "[s]ometimes . . . [not] at all." (Tr. 500).

Plaintiff said that she cried "[e]very day." (*Id.*). She was seeing a therapist

weekly, and a psychiatrist monthly. (Tr. 500-01). She took medication that

"[s]ometimes" helped with her emotional problems. (Tr. 501). Despite regular

mental health treatment, she continued to have mood swings and daily thoughts

of suicide. (Tr. 514-16). Although she previously had been hearing voices,

Seroquel prescribed by her psychiatrist had helped to control them significantly.

(Tr. 515).

Plaintiff also was taking medications for heart problems, high cholesterol

and breathing problems. (Tr. 501-02). She still was smoking despite being

advised to stop and needing Advair daily for breathing problems, but was

"trying to quit" (Tr. 502) and had cut back by a pack or two a day. (Tr. 510).

Doctors were "just now starting to do tests" for Plaintiff's complaints of

headaches, but she was taking Advil for "every day pain" from rheumatoid

arthritis in her legs, feet, hands, shoulders and neck. (Tr. 502-03, 510-11).

Plaintiff continued to take Plaquenil, Prednisone and Neurontin for her physical

symptoms, but recently had been taken off of Methotrexate due to elevated liver

enzymes.  (*Id*.).  She also had discontinued Remicade injections due to an allergic reaction.  (Tr. 504).

Plaintiff complained of numbness, "bugs and needles," and swelling in her legs.  (Tr. 503, 514).  Three to four times a week her hands are so stiff and painful that she has trouble buttoning, because her "fingers do not want to move."  (Tr. 514).  She said that her husband at times has to help her get dressed, bathe and brush her hair.  (Tr. 506, 513).  She quit cooking more than a year before because the pots became too heavy for her to lift.  (Tr. 507).  She washed dishes only when sitting on a high stool (*id*.), usually only two times a week.  (Tr. 513).  She did not sweep, mop or vacuum, and left the grocery shopping to her daughter.  (Tr. 507-08).  She could help sort the laundry, but her husband carried it.  (*Id*.).  Plaintiff estimated that she could walk up to five minutes at a time, stand up to 10 minutes at a time, and sit up to 15 minutes at a time before getting "too stiff" to stand up.  (Tr. 505-06).  She estimated that she could lift five to eight pounds at a time.  (Tr. 506).

Brian Womer, a vocational expert also testified at the hearing.  (Tr. 517-20).  He testified that a hypothetical person of Plaintiff's age, education and work experience, limited to only occasional climbing, balancing, stooping, kneeling, crouching and crawling; inside work in a temperature controlled environment;

low stress jobs with no dealing with the public, no extended periods of concentration, no production quotas and minimal contacts with co-workers and supervisors; and no work at unprotected heights, would be able to perform 20,000 jobs at the medium exertional level, 10,000 jobs at the light exertional level, and 2,000 sedentary jobs. (Tr. 517-18). He also testified that someone unable to work two to four days a month due to psychological symptoms could not maintain employment. (Tr. 519-20).

Turning to the remaining information in the administrative record, the most significant evidence for purposes of the present case consists of Plaintiff's medical records and the opinions of several medical sources.

*Cassano Health Center*. Plaintiff has treated with various physicians at the Corwin Nixon Clinic – subsequently renamed the Cassano Health Center ["Cassano"] – since at least January 2003. (*See* Tr. 263-339, 357-405, 417-28, 451-52). During her evaluation on January 20, 2003, Plaintiff complained of joint pain in her shoulders, elbows, wrists, feet, legs, hips and back, as well as low energy and leg weakness, swelling and spasms. (Tr. 337). In February 2003, she was diagnosed with arthralgia, a history of irregular heartbeat, and depression. (Tr. 334). In April 2003, James Beegan, M.D., a physiatrist, performed an electrodiagnostic evaluation of Plaintiff's bilateral upper and lower limbs,

pursuant to her complaints of widespread pain. (Tr. 194-97). He diagnosed right and left carpal tunnel syndrome of mild severity, and "[o]therwise normal" electrodiagnostic study results. (Tr. 195). In June 2003, Plaintiff's diagnoses were recorded as fibromyalgia, arthralgia and synovitis. (Tr. 324).

Michael W. Stevens, M.D., evaluated Plaintiff in September 2003 for complaints of "pain and swelling in her hands." (Tr. 198-203). Musculoskeletal examination revealed good range of the cervical spine with no active tenderness; 2+ synovitis of the wrists and the metacarpophalangeal ["MCP"]; no swollen knees; and pain on palpation of the ankles. (Tr. 198). Dr. Stevens diagnosed probable seronegative rheumatoid arthritis and prescribed Prednisone. (Tr. 198). A bone density scan in January 2004 showed "normal" bone mineralization of the left hip and lumbar spine. (Tr. 204).

Physicians thereafter treating Plaintiff at Cassano found that Plaintiff had elevated sedimentation rates. (Tr. 268, 280, 291, 373, 425-26). On February 1, 2005, Plaintiff's Rheumatoid Factor ["RF"] also was positive. (Tr. 270). In light of that positive RF, her Prednisone and Methotrexate dosages were increased, and Remicade injections were recommended. (Tr. 263-64). Because Plaintiff had severe side effects from Remicade, that treatment was discontinued after only a few injections. (Tr. 406-12).

Despite regular treatment for rheumatoid arthritis, Plaintiff reported in September 2006 that she needed her husband's help to get dressed and comb her hair. She was falling frequently, was most bothered by her feet and hands, and had difficulty straightening her fingers. (Tr. 359). Continuing examination notes reflected a reduced range of motion in Plaintiff's joints, particularly the wrists, ankles, fingers and knees. (Tr. 358-59, 369, 381, 421). Examining physicians also noted joint swelling, synovitis of the fingers, and lower extremity numbness. (Tr. 358-59, 361, 369, 421, 452).

On June 11, 2007, Cassano treating physician Staci Smith, D.O., completed a medical assessment of ability to do work-related activities. (Tr. 429-33). Dr. Smith thought that Plaintiff could lift or carry up to only five pounds occasionally and two and one-half pounds frequently; could stand and walk for less than one hour a day; and could sit up to four hours during the workday, but for only one hour at time. (Tr. 430). Dr. Smith noted that Plaintiff should perform postural activities (*i.e.*, climbing, crawling, kneeling, stooping) only occasionally, and that Plaintiff's ability to push and pull was limited. (Tr. 431).

In addition to the physical difficulties described above, Plaintiff's medical records also reflect psychological symptoms. Prior to April 2002, Plaintiff reported crying "at the drop of a hat." (Tr. 180). In January 2003, she felt

depressed and had frequent crying spells and disturbed sleep. (Tr. 335-37).

Progress notes at that time recorded Plaintiff's flat affect and depressed mood,

and reflect that she was "tearful multiple times during visit." (Tr. 336).

Diagnoses included depression with anxiety, and Wellbutrin was prescribed.

(*Id.*).

Plaintiff thereafter continued to report anxiety and depression-related

symptoms that waxed and waned. (*See* Tr. 263-89). On August 14, 2003, Plaintiff

expressed feeling depressed, with crying spells and suicidal thoughts. (Tr. 320).

In September 2003, she still was depressed, despite taking Wellbutrin as

prescribed, and was prescribed alternative antidepressants. (Tr. 318). In October

2003, she reported improved energy and stable moods. (Tr. 313). In September

2006, however, a treating physician noted that she was "tearful." (Tr. 358-59).

Over the course of treatment, her treating physicians adjusted her psychotropic

medications as needed. (Tr. 279, 289).

<u>William D. Padamadan, M.D.</u>  At the request of the State agency, Dr.

Padamadan, an occupational medicine specialist, examined Ms. Bishop on

December 15, 2004. (Tr. 228-36). Plaintiff reported that her pain symptoms,

mainly in her leg and hands, prevented her from doing household chores. (Tr.

228). Dr. Padamadan observed that Plaintiff entered "moaning and groaning and

walking with small steps, complaining the whole time." (*Id.*). On examination, Dr. Padamadan noted a decreased range of motion in Plaintiff's spine, shoulders and knees. (Tr. 230, 233-35). He noted that her grip strength was considerably decreased despite "no objective findings of arthropathy" and no synovitis or swelling in her wrist, hands or fingers. (Tr. 230). Dr. Padamadan diagnosed a "functional disorder with pain syndrome," along with obesity and a history of hyperlipidemia. (Tr. 231). Although he found "objectively" no "demonstrable lesions of arthritis or any trigger points of fibromyalgia," Dr. Padamadan opined that Plaintiff's "mental attitude and physical activities might interfere with work related activities." (*Id.*).

*Jerry McCloud, M.D.* Performing a physical Residual Functional Capacity ["RFC"] assessment on behalf of the Ohio BDD on January 13, 2005, State agency reviewing physician Dr. McCloud found that Plaintiff's complaints "are not fully consistent with the objective findings." (Tr. 260). Overall, he concluded that Ms. Bishop could perform medium work exertionally. (*See* Tr. 255-62).

*Paul Heban*. State agency physician Dr. Heban reviewed Plaintiff's file on April 11, 2005, on "reconsideration" for the Ohio BDD. (Tr. 340-48). Dr. Heban deemed Plaintiff's statements "partially credible," although "[s]ymptoms exceed objective medical evidence in the medical record." (Tr. 346). He opined that

Plaintiff should be able to lift or carry up to 20 pounds occasionally, or 10 pounds frequently, and sit, stand or walk up to six hours out of an eight-hour workday. (Tr. 342). He found that Plaintiff's condition "does not meet or equal" any Listing. (Tr. 340).

_Alan R. Boerger, Ph.D._ On December 6, 2004, Dr. Boerger, a clinical psychologist, evaluated Plaintiff for the State agency. (Tr. 221-27). Plaintiff told Dr. Boerger that she had been depressed for over five years. (Tr. 223). She felt hopeless, irritable and nervous, and had trouble sleeping. (Tr. 223-24). On testing, Plaintiff's IQ scores fell within the low average to borderline range, but Dr. Boerger felt that the current scores "may be lowered as a result of the combination of emotional and physical problems." (Tr. 225). Reading comprehension scores were "well above expectancy relative to overall intellectual functioning," suggesting to Dr. Boerger that Plaintiff's prior intellectual functioning "may have been in the average range." (Tr. 226). The scores on Wechsler Memory Scale-III ranged from borderline to average, leading Dr. Boerger to opine that Plaintiff's mild memory problems "may be associated with emotional factors such as depression as well as her physical problems." (_Id._).

Dr. Boerger diagnosed Major Depressive Disorder, Single Episode, Moderate;, Anxiety Disorder NOS; and a GAF of 50. Dr. Boerger felt that

Plaintiff's ability to relate to others and to withstand the stress and pressure of daily work activity was moderately to markedly impaired, and that her ability to follow instructions and to maintain attention and concentration was moderately impaired. (Tr. 227).

*Michael D. Wagner, Ph.D.* Psychologist Dr. Wagner reviewed the psychological evidence for the State agency on January 12, 2005. (Tr. 237-54). Dr. Wagner thought that Plaintiff's abilities to perform activities of daily living, to maintain social functioning, and to maintain concentration, persistence or pace all were moderately limited. (Tr. 247). He nonetheless found that her concentration was sufficient to perform simple, routine tasks in an environment with only superficial interaction with others. (Tr. 253). Her stress tolerance was considered moderately limited, and her statements "credible." (*Id.*).

*Tonnie A. Hoyle, Psy.D.* Reviewing psychologist Dr. Hoyle affirmed Dr. Wagner's findings on April 7, 2005. (Tr. 237).

*Becky Krebs, M.A., P.C.* On May 21, 2007, counselor Krebs completed a psychosocial assessment of Plaintiff for Western Counseling. (Tr. 440-47). She found that Plaintiff was depressed, anxious and irritable, felt helpless and hopeless, and had suicidal thoughts daily. (Tr. 440). Plaintiff had "frequent changes in her level of mood." (*Id.*). On mental status evaluation, Plaintiff's

"affect and mood were labile and depressed as well as angry." (Tr. 445). She cried frequently during the evaluation. (Tr. 440). Ms. Krebs diagnosed Major Depressive Disorder, Recurrent, Moderate; Panic Disorder with Agoraphobia, and a GAF of 52, and recommended ongoing individual counseling and psychiatric care. (Tr. 446-47).

Ms. Krebs followed with Plaintiff through August 27, 2007, when she again appeared with a labile mood, anger and pressured speech. (Tr. 467). Plaintiff described hearing "angry[,] threatening, negative, critical" "outside voices." (*Id.*). Additionally, Plaintiff reported hiding in her closet daily to isolate. (*Id.*). The counselor made a notation to consult Dr. Vishnupad (*id.*), which eventually led to Plaintiff's hospitalization. (Tr. 464).

Although she demonstrated "[l]ess lability" and "improved affect" at the September 4, 2007 appointment after her discharge from the hospital, Plaintiff continued to describe the world as "cloudy" and "scary." (Tr. 460). Ms Krebs noted that Plaintiff also had a "surprising level of psychomotor agitation." (*Id.*).

*Kalpana Vishnupad, M.D.* Psychiatrist Dr. Vishnupad saw Plaintiff as an outpatient for a psychiatric evaluation through Clark County Mental Health Services on July 24, 2007. (Tr. 454). On mental status examination, he noted that Plaintiff had a depressed mood with a constricted affect. (*Id.*). Dr. Vishnupad

diagnosed Major Depressive Disorder and started Plaintiff on Lexapro, an antidepressant. (*Id.*). On August 28, 2007, Plaintiff was tearful, reported feeling "mixed up" and "panicky," helpless and hopeless, and wanting to die. (Tr. 466). At Dr. Vishnupad's suggestion, Plaintiff was admitted that day to a psychiatric Adult Care Unit. (Tr. 464). On admission, she reported, "I get depressed, I get anxious, I don't want to leave the house. I need help." (Tr. 461). She had "extreme anxiety," felt phobic, had an increase in "death wishes in the last few days," and was experiencing derogatory auditory hallucinations. (*Id.*). Admitting diagnoses included Major Depressive Disorder with Psychotic Features, rule out Bipolar Disorder, and a GAF of 20. (Tr. 462).

Plaintiff was discharged on August 29, 2007, with a referral back to counseling and for psychiatric follow-up. (Tr. 438-39). On September 10, 2007, Dr. Vishnupad and Ms. Krebs collaborated on an assessment of Plaintiff's mental ability to do work-related activities. (Tr. 448-50). They indicated that Plaintiff had poor or no ability to deal with daily work stresses, function independently, maintain attention/concentration or remember and carry out detailed job instructions. (Tr. 448-49). Her ability to relate to coworkers, demonstrate reliability, behave in an emotionally stable manner and relate predictably in social situations was deemed "fair." (Tr. 448-50).

## III.   ADMINISTRATIVE REVIEW

### A.   <u>Applicable Standards</u>

The term "disability" as defined by the Social Security Act carries a specialized meaning of limited scope.  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are "medically determinable" and severe enough to prevent the claimant from (1) performing his or her past job, and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.[2]  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence.  (*See* Tr. 19-32); *see also* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.   Is the claimant engaged in substantial gainful activity?

2.   Does the claimant suffer from one or more severe impairments?

3.   Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an

---

[2]Impairments also must be expected either to cause death or last 12 months or longer.  *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.

impairment set forth in the Commissioner's Listing of
Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity,
can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work
experience, and residual functional capacity, can the
claimant perform other work available in the national
economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279

F.3d 348, 354 (6th Cir. 2001).

## B. The ALJ's Decision

At Step 1 of the sequential evaluation, ALJ Padilla found that Plaintiff met

the insured-status requirements for Social Security eligibility through December

31, 2008. (Tr. 16). The ALJ also found at Step 1 that Plaintiff had not engaged in

substantial gainful activity since her claimed disability onset date of December 1,

2002. (*Id.*).

The ALJ found at Step 2 that Plaintiff has the severe impairments of

obesity, generalized arthralgias with underlying diagnoses of fibromyalgia or

seronegative rheumatoid arthritis; and depression. (*Id.*).

The ALJ determined at Step 3 that Plaintiff does not have an impairment or

combination of impairments that meet or equal the level of severity described in

Appendix 1, Subpart P, Regulations No. 4. (*Id.*).

At Step 4, the ALJ found that Plaintiff is capable of performing the basic exertional requirements of "medium work" as defined for Social Security purposes, if she is limited to occasional climbing of ladders; no unprotected heights; frequent stairs, balancing; stooping, kneeling, crouching, crawling; limited to inside work in a temperature-controlled environment; low stress jobs with no dealing with the public, no production quotas, and minimal contact with supervisors and co-workers; and no extended periods of concentration. (Tr. 20).

The ALJ further found that Plaintiff is unable to perform her past relevant work as a press operator (Tr. 23), but found at Step 5 that Plaintiff could perform a significant number of jobs in the national economy. (Tr. 24-35). This assessment, along with the ALJ's findings throughout his sequential evaluation, led him ultimately to conclude that Plaintiff was not under a disability and hence not eligible for DIB or SSI. (Tr. 25).

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: whether substantial evidence in the administrative record supports the ALJ's factual findings and whether the ALJ "applied the correct legal criteria." *Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

"Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F.3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of "'more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review of the administrative record and the ALJ's decision is not *de novo*. *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The required analysis is not driven by whether the Court agrees or disagrees with an ALJ's factual findings or whether the administrative record contains evidence contrary to those findings. *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld "as long as they are supported by substantial evidence." *Rogers*, 486 F.3d at 241 (citing *Her*, 203 F.3d at 389-90).

The second line of judicial inquiry – reviewing the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *See Bowen*, 478 F3d at 746. This occurs, for example, when the ALJ has failed to follow the Commissioner's "own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a

substantial right." *Bowen*, 478 F.3d at 746 (citing in part *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir.2004)).

## V. DISCUSSION

### A. The Parties' Contentions

Plaintiff contends that the ALJ erred in two aspects of his assessment of Plaintiff's Residual Functional Capacity ["RFC"]: first, in his analysis of medical source opinions, including those of Plaintiff's treating physician and psychiatrist, and second, in his analysis of Plaintiff's pain and other symptoms.  (Doc. #8 at 1). Specifically, Plaintiff urges that the ALJ erred in discounting the opinion of treating physician Dr. Smith in favor of the opinions of Dr. Padamadan, a single-time examiner, and Dr. McCloud, a non-examining State agency physician.  (*Id.* at 13-15).  She further urges that the ALJ's finding regarding her mental RFC is not supported by substantial evidence.  (*Id.* at 16-18).  Additionally, Plaintiff asserts that ALJ Padilla misconstrued her testimony regarding her physical limitations and her problems with medications, and thus did not properly evaluate her pain complaints.  (*Id.* at 18-20).

In response, the Commissioner argues that substantial evidence supports the ALJ's conclusion that Plaintiff is not disabled, both as to his consideration of Dr. Smith's opinion in the context of the medical evidence as a whole, and as to

his assessment of Plaintiff's credibility with respect to her subjective complaints of pain. (Doc. #11).

### B.   Medical Source Opinions

#### 1.   Treating Medical Sources

Key among the standards to which an ALJ must adhere is the principle that greater deference is generally given to the opinions of treating medical sources than to the opinions of a non-treating medical source. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see* 20 C.F.R. § 404.1527(d)(2). This is so, the Regulations explain, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a DIB claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examiners, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2); *see also Rogers*, 486 F.3d at 242. In light of this, an ALJ must apply controlling weight to a treating source's opinion when it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.3d at 544; 20 C.F.R. § 404.1527(d)(2).

If either of these attributes is missing, the treating source's opinion is not deferentially due controlling weight, *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d at 544, but the ALJ's analysis does not end there. Instead, the Regulations create a further mandatory task for the ALJ:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable [data] . . . or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected.

Social Security Ruling 96-2p, 1996 WL 374188 at *4. The Regulations require the ALJ to continuing the evaluation of the treating source's opinions by considering "a host of other factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.2d at 544.

"[I]n all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician [or psychologist] is entitled to great deference, its non-controlling status notwithstanding." *Rogers*, 486 F.3d at 242.

### 2. Non-Treating Medical Sources

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical

issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180, at *2. Yet the Regulations do not permit an ALJ to automatically accept or reject the opinions of a non-treating medical source. *See id*. at *2-*3. The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. § 404.1527(b). To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in § 404.1527(d), including, at a minium, the factors of supportability, consistency and specialization. *See* 20 C.F.R. § 404.1572(f); *see also* Ruling 96-6p at *2-*3.

C. <u>Analysis</u>

A review of the ALJ's decision reveals a reasonably accurate summary of the medical source opinions and records. (*See* Tr. 16-18). ALJ Padilla prefaced his evaluation of the medical evidence by explicitly acknowledging that Plaintiff's arthritic condition and depression did constitute "severe impairments." (Tr. 16; *see also* Tr. 18). Nonetheless, he concluded that Plaintiff's "chronic subjective complaints about joint pain" or "all over" pain were "clearly . . . out of proportion to what has been objectively documented in the record." (Tr. 21). Within his analysis of the medical evidence, the ALJ stated as follows, *in toto*,

as to treating physician Dr. Staci Smith's opinion regarding how that pain

affected Plaintiff's work-related limitations (*see* Tr. 429-33):

> It is noted that Dr. Smith completed a questionnaire
> form for counsel in June 2007 wherein he [sic] indicated
> that the claimant was restricted to sedentary work,
> although specific function ratings suggested that she
> could not sustain sitting, standing or walking for longer
> than about five hours of a work day and could not lift
> over five pounds occasionally.  However, this cursory
> assessment by Dr. Smith is given no controlling or
> deferential weight as it is not well supported by detailed
> medical findings and is inconsistent with other
> substantial evidence.  Indeed, the questionnaire form
> responses are not supported by any detailed clinical
> data at all, and Dr. Smith just writes "see chart & labs."
> The charts and labs records are, however, full of normal
> or unremarkable medical findings that do not support
> the gloomy opinion of Dr. Smith.  Moreover, the
> claimant's own testimony indicated that she saw Dr.
> Smith only twice and has not really had any sustained
> contact with that doctor over an extended period.

(Tr. 22).

Conspicuously absent from the ALJ's analysis is any direct reference to the

treating physician rule, or to the applicable regulations and related case law

regarding evaluation of medical source opinions.  While the ALJ's comments that

Dr. Smith's opinion "is not well supported" and "is inconsistent with other

substantial evidence" (*see id.*) do track the factors under the treating physician

rule and thus serve obliquely to support that rule's inapplicability here, *see* 20

C.F.R. § 404.1527(d)(2); *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d at 544, the ALJ has provided no similar implicit nods to the regulatory requirements from which this Court may infer that he also discharged his obligation to then consider a "host of other factors." *See id.* Among those enumerated "other factors" – *i.e.*, "the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors" – the ALJ appears to invoke only the "extent of the treatment relationship," noting that Dr. Smith personally saw Plaintiff "only twice." (Tr. 22). He does not explain why he deems Dr. Smith's opinion based on two personal encounters with Plaintiff, plus her clinic's four-year history of treating Plaintiff, less reliable than Dr. Padamadan's opinion based on a single examination or Dr. McCloud's opinion based solely on a review of other doctors' findings. While the ALJ emphasizes Dr. McCloud's "specialized expertise in orthopedic medicine" (Tr. 21), he neglects even to mention Dr. Smith's specialization or that of other treating physicians on whose findings Dr. Smith presumably relied – for example, Dr. Stevens, a rheumatologist to whom Plaintiff was referred for testing and whose objective findings substantiate her arthritic problems. (*See* Tr. 198).

Moreover, ALJ Padilla failed to acknowledge that timeliness may constitute another "relevant factor" that should be considered in determining the persuasiveness of differing medical source opinions. Given the progressive nature of rheumatoid arthritis, Dr. Smith's June 2007 opinion regarding Plaintiff's work-related limitations arguably could have represented a more accurate depiction of Plaintiff's abilities at the time of the September 2007 hearing than would Dr. Padamadan's December 2004 opinion or Dr. McCloud's January 2005 opinion. Yet in choosing to place greater reliance on those earlier opinions, the ALJ ignored the fact that both non-treating physicians' opinions antedated treating physician Dr. Smith's opinion by more than two and one-half years.

In light of these omissions, the ALJ does not appear to have complied with the Commissioner's own procedural constraints regarding the evaluation of medical source opinion. Courts "require some indication that the ALJ at least considered [such] facts before giving greater weight to a[ non-treating physician's] opinion.'" *Blakley v. Comm'r of Soc. Sec.*, No. 08-6270, 2009 WL 3029653, at *9 (6th Cir. Sept. 24, 2009) (citing *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007)). Again,

> [w]hen the treating physician's opinion is not
> controlling, the ALJ, in determining how much weight
> is appropriate, must consider a host of factors, including
> the length, frequency, nature, and extent of the

> treatment relationship; the supportability and
> consistency of the physician's conclusions; the
> specialization of the physician; and any other relevant
> factors . . . However, **in all cases there remains a
> presumption, albeit a rebuttable one, that the opinion
> of a treating physician is entitled to great deference, its
> non-controlling status notwithstanding** . . .

*Rogers*, 486 F.3d at 242 (emphasis added) (citation omitted).; *see also* Social

Security Ruling 96-2p, 1996 WL 374188, at *4 . The Sixth Circuit recently issued a

"modest reminder" reaffirming the importance of that continued weighing. *See*

*Blakley*, 2009 WL 3029653, at *10. A review of Dr. Smith's opinion does not reveal

it to be "so patently deficient that the Commissioner could not possibly credit"

them. *Wilson*, 378 F.3d at 547. In addition, as detailed by Plaintiff, the record

does contain some objective medical evidence lending to support that opinion.

(*See* Doc. #8 at 14-15). Consequently, the ALJ's errors in handling that opinion

were not harmless, *see Bowen*, 478 F.3d at 747-48; *Wilson*, 378 F.3d at 546-47, and

Plaintiff's challenge to the ALJ's evaluation of the medical source opinions is well

taken.[3]

## VI.   REMAND IS WARRANTED

---

[3]In light of the above review and the resulting need for remand of this case, as determined *infra*, further analysis of Plaintiff's remaining contentions is unwarranted.

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

In light of the finding that the ALJ made an error of law, remand of this matter to the Social Security Administration pursuant to Sentence Four is appropriate, to permit the ALJ to reassess Plaintiff's residual functional capacity. On remand, the ALJ should be directed to (1) re-evaluate the medical source opinion of Dr. Smith under the legal criteria set forth in the Commissioner's Regulations and Rulings, and as required by case law; and (2) reconsider, under the required sequential evaluation procedure, whether Plaintiff was under a disability and thus eligible for DIB or SSE. Accordingly, the case must be

remanded to the Commissioner and the ALJ under Sentence Four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendations.

**IT THEREFORE IS RECOMMENDED THAT:**

1.   The Commissioner's non-disability finding be vacated;

2.   No finding be made as to whether Plaintiff Rita D. Bishop was under a "disability" within the meaning of the Social Security Act during the period of time at issue;

3.   This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Report; and

4.   The case be terminated on the docket of this Court.

October 21, 2009                       s/Sharon L. Ovington  
                                      Sharon L. Ovington
                                      United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten [10] days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen [13] days (excluding intervening Saturdays, Sundays and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten [10] days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Am*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981).